**UNITED STATES DISTRICT COURT**
**DISTRICT OF CONNECTICUT**

| | | |
|---|---|---|
| ROBERT R. LEWIS, | : | |
|     Plaintiff, | : | CIVIL CASE NO. |
| | : | 3:20-CV-00552 (JCH) |
| v. | : | |
| | : | |
| M&T BANK CORP., ET AL., | : | MARCH 19, 2021 |
|     Defendants. | : | |

**RULING ON DEFENDANTS' MOTIONS TO DISMISS (DOC. NOS. 16 & 25)**[*]

**I.      INTRODUCTION**

Proceeding pro se, plaintiff Robert Lewis ("Lewis") brings this action against his mortgage loan servicer, M&T Bank ("M&T"), in connection with flood insurance coverage purchased by M&T on his behalf.  Complaint ("Compl.") (Doc. No. 1).  Lewis also brings this action against three subsidiaries of the insurance company Assurant, Inc.: American Security Insurance Company ("ASIC"), from whom M&T purchased the insurance at issue; Standard Guaranty Insurance Company; and Voyager Indemnity Insurance Company (collectively, the "Assurant").  Id.  Lewis alleges that, in "force-placing" flood insurance on his mortgaged property, M&T and Assurant violated the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1961 et seq., and various Connecticut laws.  Id. ¶¶ 36-108.[1]

M&T and Assurant have separately moved to dismiss the Complaint pursuant to Federal Rule of Civil Procedure 12(b)(6) for failure to state a claim upon which relief can

---

[*] Unless otherwise noted, the court uses ECF pagination in citing to the parties' filings.

[1] The court notes that what should be paragraph 108 of Lewis's Complaint is incorrectly numbered as paragraph 6.  Compl. at 31.

1

be granted. Assurant Mot. to Dismiss (Doc. No. 16); Assurant Mem. of Law in Supp. of Mot. to Dismiss ("Assurant Mem.") (Doc. No. 16-1); M&T Mot. to Dismiss (Doc. No. 25); M&T Mem. of Law in Supp. of Mot. to Dismiss ("M&T Mem.") (Doc. No. 25-1). Lewis opposes both Motions. Pl.'s Mem. of Law in Opposition to Assurant Mot. to Dismiss ("Pl.'s Opp. to Assurant Mot.") (Doc. No. 26); Pl.'s Mem. of Law in Opposition to M&T Mot. to Dismiss ("Pl.'s Opp. to M&T Mot.") (Doc. No. 36).

For the reasons stated below, defendants' Motions are granted.

## II. BACKGROUND

### A. Factual Background

In July 2010, Lewis took out a mortgage on his property in Branford, Connecticut. Compl. ¶ 37. To protect the lender's interest, the loan agreement signed by Lewis requires him to maintain hazard insurance on the property for the life of the loan. Id. ¶ 38. Should Lewis fail to maintain adequate hazard insurance, the loan agreement permits the lender to purchase such coverage on his behalf, known as lender-placed insurance ("LPI"), and then seek reimbursement from him. Id. The loan agreement provides in relevant part:

> **5. Property Insurance.** . . . If Borrower fails to maintain any of the [hazard] coverages described above, Lender may obtain insurance coverage, at Lender's option and Borrower's expense. Lender is under no obligation to purchase any particular type or amount of coverage. Therefore, such coverage shall cover Lender, but might or might not protect Borrower, Borrower's equity in the Property, or the contents of the Property, against any risk, hazard or liability and might provide greater or lesser coverage than was previously in effect. Borrower acknowledges that the cost of the insurance coverage so obtained might significantly exceed the cost of insurance that Borrower could have obtained. Any amounts disbursed by Lender under this Section 5 shall become additional debt of Borrower secured by this Security Instrument. These amounts shall bear interest at the Note rate from the date of disbursement

and shall be payable, with such interest, upon notice from Lender to Borrower requesting payment.

Id.

The flood insurance policy Lewis had obtained expired in June 2017. See id. ¶ 40. That same month, ASIC—with whom M&T had contracted to monitor its loan portfolio, see id. ¶¶ 17-19—sent Lewis a notice on M&T's behalf informing him that his flood insurance had apparently lapsed and that, if he did not provide proof of coverage, M&T intended to purchase LPI for his property. See id. ¶ 40; see also Ex. 1 to Assurant Mot. to Dismiss ("Ex. 1") (Doc. No. 16-3) at 3.[2] The notice stated that the insurance purchased by M&T might "be significantly more expensive than the insurance [Lewis could] buy [him]self" and concluded that "obtaining [his] own insurance was in [Lewis's] best interest." Ex. 1 at 3, 6. ASIC sent Lewis a second and final notice to the same effect the following month. See Compl. ¶ 40; see also Ex. 2 to Assurant Mot. to Dismiss ("Ex. 2") (Doc. No. 16-4).

Subsequently, when Lewis failed to obtain or provide proof of coverage, M&T purchased LPI from ASIC. See Compl. ¶¶ 39-40. That insurance was purchased at rates approved by, and on file with, the Connecticut Insurance Department ("CID").[3] M&T, in turn, sought reimbursement from Lewis in that amount. See Compl. ¶¶ 11, 40;

---

[2] The court considers these letters, which Assurant has attached to its Motion, to be incorporated in the Complaint by reference. See Compl. ¶ 40; see also Patrowicz v. Transamerica HomeFirst, Inc., 359 F. Supp. 2d 140, 144 (D. Conn. 2005) ("[I]n ruling on a motion to dismiss, a court is not limited to the factual allegations of the complaint but may consider 'documents attached to the complaint as exhibits or incorporated in it by reference, to matters of which judicial notice may be taken or to documents either in plaintiffs' possession or of which plaintiffs had knowledge and relied on in bringing suit.'" (quoting Brass v. Am. Film Techs., Inc., 987 F.2d 142, 150 (2d Cir. 1993)).

[3] Lewis contests this point, maintaining that Assurant did not have applicable rates on file with CID when M&T purchased LPI on his behalf in 2017. See Pl.'s Opp. to Assurant Mot. at 13-19; Pl.'s Opp. to M&T Mot. at 11-12. The court addresses this issue below. See Section IV, infra.

Ex. 3 to Assurant Mot. to Dismiss ("Ex. 3") (Doc. No. 16-5) at 3-4, 6 ("[A] payment was made by M&T in the amount of $7,500.00. . . . [Y]ou are required to reimburse M&T for this premium."). The flood insurance policy purchased by M&T covered the period from June 15, 2017, to June 15, 2018. Ex. 3 at 6.[4]

This process repeated itself in 2018 and 2019 when Lewis again failed to obtain or provide proof of voluntary flood insurance. In both years, ASIC sent Lewis two letters notifying him that he appeared to be without his own flood insurance coverage, and that M&T intended to purchase LPI if he failed to provide proof of coverage. See Compl. ¶ 40; Ex. 4 to Assurant Mot. to Dismiss ("Ex. 4") (Doc. No. 16-6); Ex. 5 to Assurant Mot. to Dismiss ("Ex. 5") (Doc. No. 16-7); Ex. 7 to Assurant Mot. to Dismiss ("Ex. 7") (Doc. No. 16-9); Ex. 8 to Assurant Mot. to Dismiss ("Ex. 8") (Doc. No. 16-10). When Lewis did not provide proof of coverage, M&T purchased LPI from ASIC at rates approved by CID and sought reimbursement from Lewis in that amount. See Compl. ¶¶ 39-40; see also Ex. 6 to Assurant Mot. to Dismiss ("Ex. 6") (Doc. No. 16-8); Ex. 9 to Assurant Mot. to Dismiss ("Ex. 9") (Doc. No. 16-11). The 2018 policy purchased by M&T covered the period from June 15, 2018, to June 15, 2019, and the 2019 policy covered the period from June 15, 2019, to June 15, 2020. Ex. 6 at 6; Ex. 9 at 6.

Lewis alleges that the amount M&T billed him for LPI was inflated because those charges did not reflect hidden rebates received by M&T on its LPI purchase from ASIC.

---

[4] The notice sent to Lewis informing him of the force-placed coverage indicates that Lewis could have still obtained his own coverage, and that, had he done so, the LPI would have then been canceled as of the effective date of that coverage and Lewis would have been charged only for the days he was uninsured for flood coverage, if any. Ex. 3 at 4 ("Upon receipt of insurance verification or billing information, the lender placed insurance will be canceled, as of the effective date of proof of insurance coverage. If there was no lapse of flood insurance between the old and new coverage, you will receive a full refund. However, if there was a lapse, you will be charged for the number of days that coverage was provided under the policy we purchased.").

Specifically, Lewis alleges that M&T agreed to buy LPI exclusively from Assurant. Compl. ¶¶ 7, 17-18. In exchange for this exclusive right, Assurant agreed to take over from M&T certain mortgage servicing functions—e.g., monitoring M&T's loan portfolio for lapses in coverage, sending notice letters like those received by Lewis, and customer service—either at a discount or for free, thereby reducing M&T's operational expenses. Id. ¶¶ 3, 7, 17-19. In addition, Assurant pays M&T "unearned commissions," unmerited "expense reimbursements," and "illusory reinsurance premiums" in exchange for the exclusive right to be M&T's LPI provider. Id. ¶¶ 7, 16, 22-24. These alleged "kickbacks" effectively offset the price paid by M&T for LPI. Id. ¶¶ 7, 26. M&T, however, does not charge borrowers like Lewis this discounted price. Rather, it charges the larger, pre-rebate amount and pockets the difference. Id. ¶¶ 8, 11, 16, 25-26, 77. M&T does this despite Lewis's loan agreement and the notices he received from ASIC, both of which indicate that he would be required to reimburse M&T only for the "cost of the insurance" coverage. See id. ¶¶ 38, 40; see also id. ¶¶ 10, 25, 75-76.

      B.     Procedural Background

On April 24, 2020, Lewis filed an eight-count Complaint against M&T and Assurant. As against all defendants, Lewis alleges fraud (Count One) and violations of RICO (Counts Seven and Eight). Compl. ¶¶ 36-46, 87-108. As against M&T only, he alleges breach of the implied covenant of good faith and fair dealing (Count Two), breach of contract (Count Three), unjust enrichment (Count Four), violation of the Connecticut Unfair Trade Practices Act (Count Five). Compl. ¶¶ 47-81. As against Assurant only, he alleges tortious interference with a business relationship (Count Six). Compl. ¶¶ 82-86. M&T and Assurant have separately moved to dismiss all claims pursuant to Federal Rule of Civil Procedure 12(b)(6).

On February 25, 2021, the court held oral argument on the respective motions to dismiss, at which Lewis and counsel for the respective defendants appeared. See Amended Calendar Notice (Doc. No. 65); Minute Entry (Doc. No. 67). At oral argument, the court sought to: (1) better understand the exhibits, submitted by Assurant in support of its Motion to Dismiss, documenting various of ASIC's rate filings with the CID; (2) clarify whether and how those filings could be accessed by the public; and (3) clarify the basis for Lewis's contention that Assurant did not have applicable rates on file with CID when M&T purchased LPI on his behalf in 2017. Following oral argument, the parties submitted supplemental briefing, as requested by the court. Assurant Supplemental Mem. in Supp. of Mot. to Dismiss ("Assurant Supplemental Mem.") (Doc. No. 68); Pl.'s Reply Mem. in Opposition to Assurant Supplemental Mem. ("Pl.'s Supplemental Mem.") (Doc. No. 69).

## III.   LEGAL STANDARD

When deciding a motion to dismiss pursuant to Rule 12(b)(6), the court must determine whether the plaintiff has stated a legally cognizable claim by making allegations that, if true, would plausibly show that the plaintiff is entitled to relief. See Bell Atl. Corp. v. Twombly, 550 U.S. 544, 557 (2007). The court takes all factual allegations in a complaint as true and draws all reasonable inferences in the plaintiff's favor. See Crawford v. Cuomo, 796 F.3d 252, 256 (2d Cir. 2015). However, the tenet that a court must accept a complaint's allegations as true is inapplicable to "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements." Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (citing Twombly, 550 U.S. at 555).

To survive a Rule 12(b)(6) motion, "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" Iqbal,

556 U.S. at 678 (quoting Twombly, 550 U.S. at 570). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Iqbal, 556 U.S. at 678 (quoting Twombly, 550 U.S. at 556). Dismissal under Rule 12(b)(6) is appropriate when "it is clear from the face of the complaint, and matters of which the court may take judicial notice, that the plaintiff's claims are barred as a matter of law." Associated Financial Corp. v. Kleckner, 480 F. App'x 89, 90 (2d Cir. 2012) (quoting Conompco, Inc. v. Roll Int'l, 231 F.3d 82, 86 (2d Cir. 2000)).

## IV.    DISCUSSION

The court notes at the outset that cases like this one are not new. Similar cases, some against ASIC,[5] have been brought in various federal courts around the country, including many in the Second Circuit. See, e.g., Leo v Nationstar Mortg. LLC, 964 F.3d 213 (3d Cir. 2020); Patel v. Specialized Loan Servicing, LLC, 904 F.3d 1314 (11th Cir. 2018); Rothstein v. Balboa Ins. Co., 794 F.3d 256 (2d Cir. 2015); Lyons v. Litton Loan Servicing LP, 158 F. Supp. 3d 211 (S.D.N.Y. 2016); Trevathan v. Select Portfolio Servicing, Inc., 142 F. Supp. 3d 1283 (S.D. Fla. 2015); Miller v. Wells Fargo Bank, N.A., 994 F. Supp. 2d 542 (S.D.N.Y. 2014); Cannon v. Wells Fargo Bank N.A., 917 F. Supp. 2d 1025 (N.D. Cal. 2013); Gallo v. PHH Mortg. Corp., 916 F. Supp. 2d 537 (D.N.J. 2012).

Significantly, in Rothstein, the Second Circuit addressed whether plaintiffs could maintain claims under, inter alia, RICO in a class action against an insurance company

---

[5] Indeed, Lewis alleges that he opted out of a class action brought elsewhere against these defendants. Compl. ¶ 9.

7

and its affiliate for their role in an LPI kickback scheme similar to the one alleged here. As here, plaintiffs were borrowers who were required by the terms of their mortgage loan agreement to maintain hazard insurance on their mortgaged properties. Rothstein, 794 F.3d at 260. When plaintiffs failed to do so, their loan servicer bought LPI from an insurance company at rates approved by regulators and then sought reimbursement from plaintiffs at those same rates. Id. Plaintiffs sued the loan servicer, the insurance company, and its affiliate, alleging "that they were fraudulently overbilled because the rates they were charged [for reimbursement] did not reflect secret rebates and kickbacks that [the loan servicer] received from [the insurance company] through [the company's] affiliate." Id. at 259. In particular, plaintiffs alleged that, in exchange for the right to be the loan servicer's exclusive LPI provider, the insurance company provided loan tracking services to the servicer through its affiliate. Id. at 260. These services, they alleged, were effectively a discount on approved rates for LPI purchased by the servicer. Id. The servicer, however, nonetheless billed plaintiffs at the regulator-approved rates. Id.

Reviewing the district court's denial of the defendants' motion to dismiss, the Second Circuit considered on appeal whether plaintiffs' claims were barred by the filed rate doctrine. Id. "Under the filed rate doctrine, any filed rate—that is, one approved by the governing regulatory agency—is per se reasonable and unassailable in judicial proceedings brought by ratepayers." Id. at 261 (quoting Wegoland Ltd. v. NYNEX Corp., 27 F.3d 17, 18 (2d Cir. 1994)). Two principles underpin the doctrine: First, the principle of "nonjusticiability" holds that "the courts should not undermine agency rate-making authority by upsetting approved rates"; and second, the principle of

"nondiscrimination" holds "that litigation should not become a means for certain ratepayers to obtain preferential rates." Rothstein, 794 F.3d at 261. A claim that implicates either principle is barred. Id. at 262. Further, the court noted that "[t]he doctrine reaches both federal and state causes of action and protects rates approved by federal or state regulators." Id. at 261.

The Rothstein court held that plaintiffs' claims implicated both the nonjusticiability and nondiscrimination principles. As to nonjusticiability, the court reasoned:

> The theory behind the claims is that Plaintiffs were overbilled when they were charged the full LPI rates (which were approved by regulators), instead of lower rates net of the value of loan tracking services provided by [the insurance company affiliate]. That theory can succeed only if the arrangement with [the affiliate] should have been treated as part and parcel of the LPI transaction and reflected in the LPI rates. But, under the nonjusticiability principle, it is squarely for the regulators to say what should or should not be included in a filed rate.

Rothstein, 794 F.3d at 262 (emphasis in original). The court also found that plaintiffs' claims ran afoul of the nondiscrimination principle because "[a]ny damages recovered by the[] Plaintiffs would operate like a rebate to give them a preference over other borrowers who were charged for LPI." Id. at 263 (ellipses, brackets, and internal quotation marks omitted) (citing Keogh v. Chi. & Nw. Ry. Co., 260 U.S. 156, 163 (1922)).

Defendants argue that Rothstein controls this case, and that the filed rate doctrine forecloses Lewis's suit. The court agrees.

As an initial matter, the state of Connecticut has conferred power on the CID to determine the reasonableness of the rates at issue here. See Conn. Gen. Stat. §§ 38a-665(a), 38a-676(a), 38a-686(a), 38a-688(b)(2). An insurer must file its premium rates for personal and commercial risk insurance with the CID Commissioner and obtain

9

approval before charging those rates. See id. §§ 38a-676(a), 38a-688(a); see also, e.g., R.C.S.A. § 38a-676-3(c) (providing that the CID Commissioner may record effective or disapprove of, inter alia, rate filings submitted pursuant to section 38a-676 of the Connecticut General Statutes); id. § 38a-676-3(d) ("The Commissioner shall disapprove the use of any such form if . . . it contains a provision or provisions which are unfair or deceptive or which encourage misrepresentation of the policy.").

Lewis does not dispute the authority of the CID Commissioner to approve or disapprove of filed LPI rates. Rather, he argues that, on April 11, 2017, ASIC withdrew all rates for the "Residential Mortgage Service Program"—under which program he contends ASIC issued its flood LPI policies—and therefore did not have applicable rates on file with CID when M&T purchased flood LPI from ASIC on his behalf in June 2017. Pl.'s Opp. to Assurant Mot. at 13-19; Pl.'s Opp. to M&T Mot. at 11-12; Pl.'s Supplemental Mem. at 5-7. In support, he attaches to his Opposition an April 11, 2017 letter from ASIC to CID stating that "[a]t this time we want to withdraw all applicable forms, rates, and rules for Residential Mortgage Service Program." Ex. 1 to Pl.'s Opp. to Assurant Mot. (Doc. No. 26-1) at 2.

Notwithstanding Lewis's arguments to the contrary, it is clear to the court that ASIC had applicable rates on file with CID in 2017, 2018, and 2019, when it issued the respective flood LPI policies that were purchased by M&T on Lewis's behalf. Assurant's post-oral argument submissions leave the court with no doubt that:

- **(1)** ASIC issues flood LPI under a program entitled "Residential and Commercial Flood Program", see, e.g., Supplemental Exhibit D (Doc. No. 68-5) at 1-2 (ASIC rate filing cover letter dated September 18, 1996, and

captioned "Residential & Commercial Flood Program", with accompanying manual page stating that "[t]his program is designed to allow [m]ortgage [c]ompanies to force place flood coverage on those mortgages which are not protected by insurance coverage per the contractual agreement between the mortgagor and mortgagee");

- **(2)** the "Residential and Commercial Flood Program" is separate and distinct from the "Residential Mortgage Service Program", for which ASIC withdrew all applicable rates in April 2017, see Supplemental Ex. G (Doc. No. 68-8) at 4 (ASIC rate filing cover letter dated September 7, 2017, stating "[o]ur Residential and Commercial Flood Program is active for use in Connecticut effective August 15, 1990"); see also Assurant Supplemental Mem. at 4-10;

- **(3)** during the periods relevant here, ASIC had approved rates on file with the CID for flood LPI issued under its "Residential and Commercial Flood Program," see Supplemental Declaration of Rebecca H. Voyles (Doc. No. 68-1) ¶¶ 5-15; id. at Supplemental Exs. D, E & F (Doc. Nos. 68-5, 68-6, 68-7) (2017); Supplemental Exs. G & H (Doc. Nos. 68-8, 68-9) (2018); Supplemental Exs. G, J & K (Doc. Nos. 68-8, 68-11, 68-12) (2019);

- **(4)** the documents evidencing ASIC's filed rates—attached as exhibits to ASIC's Supplemental Memorandum—are on file with CID[6] and a matter of

---

[6] For those filings submitted to CID in hard copy prior to the advent of electronic rate and form filing, this is indicated by a CID stamp on filings. See Supplemental Ex. D at 2; Supplemental Ex. E at 2. As to those filings submitted to CID electronically, see Supplemental Exs. G & J, the court accessed these filings for itself using the System for Electronic Rates & Forms Filing.

11

public record, and their accuracy cannot reasonably be questioned.[7] See Conn. Gen. Stat. §§ 38a-676(a), 38a-688(a)(5) (requiring rate filings to be "open to public inspection").

In sum, CID did in fact approve the premium rates charged by ASIC for the flood LPI purchased by M&T in 2017, 2018, and 2019.

It follows that this case implicates the nonjusticiability strand of the filed rate doctrine. M&T sought from Lewis reimbursement in precisely the amount it paid ASIC for LPI. See Ex. 3 at 3-4, 6 ("[A] payment was made by M&T in the amount of $7,500.00. . . . [Y]ou are required to reimburse M&T for this premium."); Ex. 6 at 3-4, 6 ("[A] payment was made by M&T in the amount of $7,955.00. . . . [Y]ou are required to reimburse M&T for this premium."); Ex. 9 at 3-4, 6 (same); see also Declaration of Ronald K. Wilson (Doc. No. 16-2) ¶¶ 9, 18-20 (2017); id. ¶¶ 12, 21-27 (2018); id. ¶¶ 15, 28-34 (2019). Lewis complains that the amount billed to him by M&T was inflated because the charges did not reflect the alleged kickbacks received by M&T from ASIC. However, because the amount billed to Lewis is equal to the premium rates approved by the CID, Lewis's claims necessarily "rest on the premise that the rates approved by regulators were too high." Rothstein, 794 F.3d at 263. However, "whether insurer-provided services should have been reflected in the calculation of LPI is not for [this

---

[7] As such, the court takes judicial notice of these CID-approved rates in considering defendants' respective Motions to Dismiss. See Apotex Inc. v. Acorda Therapeutics, Inc., 823 F.3d 51, 60 (2d Cir. 2016) (taking judicial notice of a document in considering a motion to dismiss "because [the document] is publicly available and its accuracy cannot reasonably be questioned" (citing Fed. R. Evid. 201(b)); Pani v. Empire Blue Cross Blue Shield, 152 F.3d 67, 75 (2d Cir. 1998) ("It is well established that a district court may rely on matters of public record in deciding a motion to dismiss under Rule 12(b)(6)."); see also Dane v. UnitedHealthCare Ins. Co., 401 F. Supp. 3d 231, 237 n.1 (D. Conn. 2019) (taking "judicial notice that the CID commissioner has approved the precise rates that Dane challenges here"), aff'd, 974 F.3d 183 (2d Cir. 2020).

court] to say; under the nonjusticiability principle, [that] question is reserved exclusively to the regulators." Id.

It is immaterial that Rothstein addressed this question only as it pertained to insurers.[8] Here, "the logic of the case applies to the claims against [M&T] as well," since M&T billed Lewis an amount equal to the CID-approved premium paid for LPI. See Lyons, 158 F. Supp. 3d at 226. Thus, any review by this court of the propriety of the amount billed to Lewis by M&T would necessarily entail an inquiry into whether the filed rates charged by ASIC were reasonable.[9] Id. Such an inquiry would "undermine [CID's] rate-making authority" and is thus prohibited by the filed rate doctrine. Rothstein, 794 F.3d at 262.

Nor does it matter that the kind of kickbacks here alleged differ from those at issue in Rothstein. Compare Compl. ¶¶ 3, 7, 16-19, 22-24 (alleging "unearned commissions," unmerited "expense reimbursements," and "illusory reinsurance premiums," in addition to free or discounted mortgage servicing functions) with Rothstein, 794 F.3d at 260 (noting only allegations of insurer-performed mortgage servicing functions). Regardless of the alleged kickbacks' form, "any attempt to determine what part of the rate previously deemed reasonable was a result of the fraudulent acts would require determining what rate would have been deemed

---

[8] In Rothstein, plaintiffs sued their loan servicer in addition to the insurance company and its affiliates. However, plaintiffs withdrew their suit as to the loan servicer when it filed for bankruptcy. Rothstein, 794 F.3d at 260-61.

[9] Indeed, Lewis's Complaint repeatedly assails the premium rates charged by ASIC. See, e.g., Compl. ¶ 26 (alleging that "M&T is incentivized to purchase [LPI] coverage with artificially inflated premiums"); id. ¶ 30 (excerpting an article criticizing "unjustifiably high prices by Assurant"); id. ¶ 80 (alleging that "the Assurant Defendants' [LPI] policies . . . carried exorbitant premiums"). Ultimately, Lewis's argument is that "[t]he full cost of the servicing activities is added into the force-placed amounts" charged by ASIC and "then passed on to the borrower" by M&T. Compl. ¶ 28.

reasonable absent the fraudulent acts, and then finding the difference between the two." Rothstein, 794 F.3d at 262-63 (internal quotation marks omitted) (quoting Wegoland, Ltd. v. NYNEX Corp., 806 F. Supp. 1112, 1121 (S.D.N.Y.1992)); see also Lyons, 158 F. Supp. 3d at 227 ("Regardless of the form of the alleged scheme . . . the Court cannot examine whether any form of benefit or alleged scheme impermissibly inflated the amounts charged to Plaintiffs without also examining the rates set by regulators." (emphasis in original)).

In sum, because Lewis's suit would require this court to examine LPI premium rates filed with and approved by the CID, the filed rate doctrine bars his claims. Rothstein, 794 F.3d at 263 ("Plaintiffs' claims invite judicial meddling in issues of insurance policy. Because that is forbidden under the principle of nonjusticiability, the claims are barred."); see also Pl.'s Mem. at 10 ("[T]he case law is clear on the effect of the filed rate doctrine when there is a filed rate in effect."). He thus has not plausibly alleged facts that would entitle him to relief. Iqbal, 556 U.S. at 678.

## V.   CONCLUSION

For the foregoing reasons, Assurant's and M&T Bank's respective Motions to Dismiss (Doc. Nos. 16 and 25) are granted.

**SO ORDERED.**

Dated at New Haven, Connecticut this 19th day of March 2021.

                                       /s/  Janet C. Hall
                                       Janet C. Hall
                                       United States District Judge